

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| LOUISE JONES, et al., | ) |
| | ) |
| Appellants, | ) |
| | ) WD87295 |
| v. | ) Consolidated with: |
| | ) WD87303 and WD87351 |
| MISSOURI LABOR AND | ) |
| INDUSTRIAL RELATIONS | ) Filed: August 5, 2025 |
| COMMISSION, et al., | ) |
| | ) |
| Respondents. | ) |

**Appeal from the Circuit Court of Cole County**
**The Honorable S. Cotton Walker, Judge**

**Before Division Two: Janet Sutton, P.J., and**
**Alok Ahuja and Mark D. Pfeiffer, JJ.**

The Division of Workers' Compensation in the Department of Labor and Industrial Relations approved a number of claims filed in 2022 for compensation from the Tort Victims Compensation Fund. The Division later notified the claimants that each claimant would be paid only 40% of their approved claim amount. The Division determined to pay only 40% of the awards because the General Assembly appropriated less than the total amount of the approved 2022 claims to the Division for compensation payments.

A number of claimants sued the Division, the Department, and the Labor and Industrial Relations Commission in the Circuit Court of Cole County.

(Except where the context requires that we draw finer distinctions, we refer to the plaintiffs collectively in this opinion as "Claimants," and defendants collectively as "the Division.") Claimants sought a declaratory judgment that the Division had miscalculated the amount of the compensation payments to which they were entitled. Claimants also sought an injunction to prevent the Division from paying any later-approved claims until all 2022 claimants had been appropriately paid. After conducting a bench trial, the circuit court denied Claimants any relief. The court found that Claimants' lawsuits were barred by sovereign immunity, and that Claimants had failed to exhaust their administrative remedies before filing suit. The circuit court also ruled, in the alternative, that the Division had properly calculated the amount of the payments to which the 2022 claimants were entitled.

Claimants appeal. We reject the circuit court's conclusions that Claimants suits are barred by sovereign immunity, and that they failed to exhaust their administrative remedies. On the merits, we agree with the circuit court that the Division's payment calculation was consistent with the relevant statutes. We accordingly affirm the circuit court's judgment to the extent that it found the Division's payment calculation to be lawful.

**Factual Background**

The Tort Victims Compensation Fund was originally established by the General Assembly in 1987. *See* H.B. 700, § 40, 88th Gen. Assembly, 1st Reg. Session, 1987 MO. LAWS 792, 811. The Fund was established to pay compensation to people injured by the negligence of others, who are unable to obtain full compensation from the tortfeasor. To finance the Fund, the State is given a lien

2

on fifty percent of any final judgment awarding punitive damages in Missouri courts, excluding medical malpractice actions. § 537.675.3.[1] "Seventy-four percent of all payments received by the tort victims' compensation fund . . . shall, upon appropriation, be appropriated to the division of workers' compensation to assist uncompensated tort victims . . . ." § 537.678.1; *see also* § 537.675.1(5) (defining "uncompensated tort victim"). The Division of Workers' Compensation is given "jurisdiction to determine and award compensation to or on behalf of uncompensated tort victims," § 537.678.2, and to make payments to individuals found to have eligible claims. §§ 537.684.8 to .10.

Each of the Claimants filed claims with the Division during the 2022 annual claims period (which coincides with the calendar year). In each case, the Division reviewed the Claimants' written claims applications, and made an administrative determination that the Claimants were eligible for compensation from the Fund. The Division's awards advised each Claimant that they were entitled to compensation in a particular amount, "or a lesser amount if the aggregated amount of all awards . . . exceeds the amount in the fund." The award notifications advised Claimants that they could request a hearing before an administrative law judge; if Claimants failed to do so, the notice specified that "the Administrative Determination becomes final, and no appeal may be taken to the Labor and Industrial Relations Commission or to the courts."

The total amount of the compensation awards made during the 2022 annual claims period was $373,325,000. Although the Fund balance as of June 30, 2023 was $274,418,251.31, the General Assembly appropriated only $150

_____

[1] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

million to the Division for payment of claims during the 2024 Fiscal Year. *See* H.B. 7, § 7.865, 102nd Gen. Assembly, 1st Reg. Session (2023).

Claims payments are governed by §§ 537.684.8 and .9, which provide:

> 8.      For payment of all claims from the fund, the division shall determine the aggregate amount of all awards made on those claims filed during an annual claims period. Such determination shall be made on or before the thirtieth day of June in the next succeeding year. If the aggregate value of the awards does not exceed the total amount of money in the fund, then the awards shall be paid in full on or before the thirtieth day of September in the next succeeding year. ***If the aggregate value of the awards does exceed the total amount of money in the fund, then the awards shall be paid on a pro rata basis on or before the thirtieth day of September in the next succeeding year***.

> 9.      If there are no funds available, then no claim shall be paid until funds have accumulated in the tort victims' compensation fund and have been appropriated to the division for payment to uncompensated tort victims. When sufficient funds become available for payment of claims of uncompensated tort victims, awards that have been determined but have not been paid shall be paid in chronological order with the oldest paid first, based upon the date on which the application was filed with the division. Any award pursuant to this subsection that cannot be paid due to a lack of funds appropriated for payment of claims of uncompensated tort victims shall not constitute a claim against the state.

(Emphasis added.) The proper construction of these statutory provisions – and of the emphasized sentence in particular – lies at the heart of this litigation.

The Division determined to pay only 40% of the compensation awarded for claims filed in 2022, based on the ratio between the legislature's Fiscal Year 2024 appropriation for payment of Fund claims, and the total amount of the 2022 awards. In 2023, the Division mailed to each Claimant a "Notice of Final Payment of Claim." The Notice advised each Claimant that the Division had

4

determined to pay only 40% of each Claimant's award. The Notice specified that the 40% payment "is the full and final payment of the claim." The Notice did not advise Claimants that any administrative or judicial review of the Division's payment determination was available.

Claimants filed two lawsuits in the Circuit Court of Cole County challenging the Division's payment calculation. The first lawsuit was filed on July 28, 2023 by Louise Jones and four other named Claimants, as a putative class action. The second lawsuit was filed on August 23, 2023, by Jessica Aaron and 140 additional named Claimants. Each lawsuit named as defendants the Labor and Industrial Relations Commission and its members in their official capacities; the Department of Labor and Industrial Relations and its Director in her official capacity; and the Division of Workers' Compensation and its Director in her official capacity.

Both the *Jones* and *Aaron* lawsuits contended that the Division had improperly calculated the percentage of the Claimants' awards which were entitled to payment. Claimants contended that the reference in § 537.684.8 to "the total amount of money in the fund" referred to *the total Fund balance* as of June 30 of the year succeeding the annual claims period, rather than to *the amount appropriated by the General Assembly* to the Division for payment of claims. Claimants asserted that the Division had erroneously used the amount of the General Assembly's Fiscal Year 2024 appropriation ($150 million) in its calculation, rather than the total balance in the Tort Victims Compensation Fund on June 30, 2023 ($274,418,251.31). Use of the higher Fund balance would

5

result in Claimants being entitled to payment of 73.5% of the amounts they were awarded, rather than merely 40%.

Both lawsuits asked the circuit court to declare: that the Division had improperly calculated the percentage of Claimants' awards which were entitled to payment; that the calculation should be based on the total Fund balance, rather than on the legislature's appropriation; and that the Division's payment of 40% of the amount awarded did not constitute full and final satisfaction of the 2022 awards. The Claimants also requested that the court enjoin the Division from paying any later-filed claims until the Claimants' properly-discounted awards were fully paid.

Besides seeking the declaratory and injunctive relief described above, Claimants' lawsuits sought no other substantive relief. In particular, Claimants did not ask the circuit court to order that the Division make compensation payments beyond the $150 million appropriated to the Division for compensation payments in 2025. Instead, Claimants proposed that, if the appropriated amount was insufficient to pay all approved 2022 claims (as properly discounted) then the claims should be paid in chronological order based on the date of each claimant's application for compensation, until the appropriated funds were exhausted. The unpaid claims would remain pending until future appropriations were sufficient to satisfy them. Both lawsuits also prayed for an award of the Claimants' attorney's fees from "the common fund or common benefit" they achieved on behalf of 2022 claimants generally.

The circuit court consolidated the two cases. The Division moved to dismiss, and later for judgment on the pleadings, on the basis that Claimants'

6

action was barred by sovereign immunity; that Claimants had failed to exhaust their administrative remedies; that Claimants had filed suit against the wrong parties in the wrong court; and that the Division's payment calculation complied with §§ 537.684.8 and .9. The circuit court denied both motions.

The circuit court held a bench trial on April 5, 2024. On June 21, 2024, the circuit court issued its judgment, which ruled in the Division's favor. Although the court had denied earlier motions raising the same issues, the judgment found that Claimants' suits were barred by sovereign immunity, and that Claimants had failed to exhaust their administrative remedies because they had not filed an application for review of the Division's payment calculation with the Labor and Industrial Relations Commission. Even though the court's sovereign immunity and administrative exhaustion rulings addressed threshold issues which required the dismissal of Claimants' suits, the judgment also held, on the merits, that the Division had properly calculated the payment amounts for the approved 2022 claims.

Claimants appeal.

## Discussion

The *Jones* and *Aaron* plaintiffs filed separate briefs as appellants, each asserting multiple points. Claimants challenge the circuit court's rulings that they failed to properly exhaust their administrative remedies, and that their suits are barred by sovereign immunity. Claimants also challenge the circuit court's exclusion of evidence of the manner in which the Division paid Fund claims in prior years; Claimants contend that the Division's past practice is inconsistent with the manner in which the Division calculated payment amounts for claims

7

approved in 2022. Finally, Claimants challenge the circuit court's conclusion that the Division's payment calculation for the 2022 annual claims period is consistent with §§ 537.684.8 and .9. The *Jones* plaintiffs also challenge the circuit court's summary denial of their request for certification of a class consisting of all 2022 award recipients.

Because they involve issues of law, we review questions of statutory interpretation, sovereign immunity, and administrative exhaustion *de novo*. *Ramirez v. Mo. Prosecuting Att'ys Retir. Sys.*, 694 S.W.3d 432, 435 (Mo. 2024) (statutory interpretation, sovereign immunity); *Planned Parenthood of St. Louis Region v. Knodell*, 685 S.W.3d 377, 383 (Mo. 2024) (administrative exhaustion).

"Appellate review of error alleged in the exclusion of evidence is limited to an abuse of discretion standard. Absent clear abuse of discretion, the trial court's action will not be grounds for reversal." *Cluck v. Union Pac. R.R. Co.*, 367 S.W.3d 25, 28 n.4 (Mo. 2012) (citing *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. 2011)). Even if an evidentiary ruling is erroneous, it will only justify reversal if the erroneous ruling prejudiced the appellant; "[a]n error is prejudicial only if it caused outcome-determinative prejudice materially affecting the merits of the action." *Piers v. Mo. Dep't of Corr.*, 688 S.W.3d 65, 73 (Mo. App. W.D. 2024) (cleaned up).

The denial of class certification is reviewed for an abuse of discretion. *Hootselle v. Mo. Dep't of Corr.*, 624 S.W.3d 123, 133 (Mo. 2021).

## I.

We begin by addressing the circuit court's conclusion that Claimants failed to exhaust their administrative remedies.

The circuit court concluded that § 537.690.1 required Claimants to file an application for review with the Labor and Industrial Relations Commission before filing suit to challenge the Division's payment calculation. Section 537.690.1, which specifically relates to claims for compensation from the Tort Victims Compensation Fund, provides:

> Any of the parties to **a decision of the division on a claim heard under the provisions of sections 537.675 to 537.693** may, within thirty days following the date of notification or mailing of such decision, file a petition with the labor and industrial relations commission to have the decision reviewed by the commission. The commission may allow or deny a petition for review. If a petition is allowed, the commission may affirm, reverse or set aside the decision of the division on the basis of the evidence previously submitted in such case or may take additional evidence or may remand the matter to the division with directions. The commission shall promptly notify the parties of its decision and the reasons therefor.

(Emphasis added.)

Section 537.690.1 does not apply to the Division's payment calculation. The payment calculation is not a "decision . . . on a claim" for compensation, but is instead a global determination unrelated to the particulars of any individual claim for compensation. The Division's own regulations recognize that the award made on an individual claim – not the payment calculation – constitutes the Division's "final decision" on the claim. Further, the payment calculation is not a matter "heard" by the Division, since claimants are not notified that the payment issue is being decided, or given an opportunity to state a position concerning the payment calculation before the decision is made. Moreover, no record is created in connection with the payment decision, and there is accordingly no "evidence previously submitted" on the basis of which the Commission could perform a

9

review.  Finally, the Division's and the Commission's own regulations contemplate that only individual compensation awards – not the global payment calculation – will be subject to Commission review.

**A.**

The Division's regulations define an "award" on an individual claim as the final decision on that claim.  The regulations define an "award" as follows:

> 1.    Award – A final administrative determination made by the division on a claim against the Tort Victims' Compensation Fund, or a final decision made by an administrative law judge or legal advisor following an evidentiary hearing, or a final decision by the Labor and Industrial Relations Commission or by the appellate court.

8 CSR 50-8.010(2)(B)1.

An "award" is the decision on an individual compensation claim.  The Division's regulations specify that, within sixty days of receiving a claim for compensation from the Fund, the Division will notify the claimant of the Division's "administrative determination" on the claim.  The regulations specify that, if the claimant does not timely request a hearing, "the administrative determination shall become the final award in the case."  8 CSR 50-8.010(4)(D).

If the claimant requests a hearing, the hearing is held before an administrative law judge or legal advisor.  8 CSR 50-8.010(5)(B).  The regulations provide that, "[w]ithin thirty (30) days after the conclusion of the evidentiary hearing, the administrative law judge or legal advisor shall issue the decision in the case, either awarding compensation in an amount certain or denying compensation in full."  8 CSR 50-8.010(5)(G).

Notably, the Division's regulations presume that individual claims have been finally determined *before* the payment calculation is made.  The regulation describing the payment calculation states that the payment determination will be made on June 30, based on "the aggregated amount of all final, unappealable awards."  8 CSR 50-8.010(7)(A).  The regulation also specifies that "[a]ny award that is not final as of the date of the determination (due to a pending petition for review before the commission, or due to a pending appeal before the court of appeals) shall not be figured into this determination . . . ."  *Id.*

Thus, the Division's regulations make clear that a "final decision" on a claim occurs when the claimant accepts the award made in an administrative determination, or when the claim is decided by an ALJ or legal advisor after hearing, or by the Commission on review.  The individual awards issued to individual claimants – not the global payment calculation of which claimants are advised months later – constitutes the "decision of the division on a claim" which is subject to Commission review under § 537.690.1.

**B.**

The relevant statutes and regulations also make clear that only individual claims, and not the global payment calculation, are "heard" by the Division.

The statutes establishing the Fund specify the procedures under which individual claims for compensation are decided.  Sections 537.678.3 through .6 describe in detail how a claimant can provide information to the Division supporting their entitlement to an award:

> 3.    Claims shall be made by filing an application for compensation with the division.  The division shall furnish an application form which shall include:

11

(1)     The name and address of the uncompensated tort victim;

(2)     If the claimant is not the uncompensated tort victim, the name and address of the claimant and relationship to the victim, the name and address of any dependents of the victim, and the extent to which each is so dependent;

(3)     The date and nature of the tort on which the application for compensation is based;

(4)     The date and court in which a judgment was rendered against the tort-feasor, including the judgment amount specifying medical costs, if available.  If no final judgment was obtained and the claimant is requesting a waiver pursuant to subsection 2 of this section, the application shall include a statement establishing the basis for a waiver;

(5)     The nature and extent of the injuries sustained by the victim, the names and addresses of those giving medical and hospital treatment to the victim and whether death resulted;

(6)     The loss to the claimant or a dependent resulting from the injury or death;

(7)     The amount of benefits, payments or awards, if any, payable from any source that the claimant or dependent has received or for which the claimant or dependent is eligible as a result of the injury or death;

(8)     Releases by the claimant authorizing any reports, documents and other information relating to the matters specified pursuant to this section to be obtained by the division; and

(9)     Any other information as the division determines is necessary.

4.     In addition to the application, the division may require that the claimant submit materials substantiating the facts stated in the application.

5.     If the division finds that an application does not contain the required information or that the facts stated therein have not been substantiated, it shall notify the claimant in writing of the specific additional items or information or materials required and that the claimant has thirty days from the date of mailing in which to furnish those items to the division. . . .

6.     The claimant may file an amended application or additional substantiating materials to correct inadvertent errors or omissions at any time before the division has completed its consideration of the original application.

The Division's regulations provide further detail concerning the procedures for submitting, and supplementing, a claims application. *See* 8 CSR 50-8.010(3). The regulations specify that the written materials submitted by the claimant provide the basis for the Division's initial "administrative determination" of the claim. 8 CSR 50-8.010(4).

Following the submission of written documentation, §§ 537.684.3 through .5 then detail the procedures for the hearing on a claim, and the criteria that the Division must apply in making its decision:

3.     Each claim shall be filed in person or by mail. The division shall investigate such claim prior to the opening of formal proceedings. The director of the division shall assign an administrative law judge, associate administrative law judge or legal advisor within the division to hear any claim for compensation filed. The claimant shall be notified of the date and time of any hearing on the claim. In determining the amount of compensation for which a claimant is eligible, the division shall:

(1)     Consider the facts stated on the application filed pursuant to section 537.678;

(2)     Obtain a copy of the final judgment, if any, from the appropriate court;

(3)     Determine the amount of the loss to the claimant, or the victim's survivors or dependents; and

13

(4)     If there is no final judgment, determine the degree or extent to which the victim's acts or conduct provoked, incited or contributed to the injuries or death of the victim.

4.     The claimant may present evidence and testimony on his or her own behalf or may retain counsel.

5.     Prior to any hearing, the person filing a claim shall submit reports, if available, from all hospitals, physicians or surgeons who treated or examined the victim for the injury for which compensation is sought.  If, in the opinion of the division, an examination of the injured victim or a report on the cause of death of the victim would be of material aid, the division may appoint a duly qualified, impartial physician to make an examination and report.  A finding of the judge or jury in the underlying case shall be considered as evidence.

The Division's regulations supplement §§ 537.684.3 through .5 concerning the procedures applicable when a claimant timely requests a hearing on their claim. 8 CSR 50-8.010(5)(A) through (F).  Although the rules provide that "[t]he evidentiary hearing shall be a simple informal proceeding," they also provide that "[t]he rules of evidence in civil cases in the state of Missouri shall apply, except that the administrative law judge or legal advisor may take official notice of the contents of the division's file."  8 CSR 50-8.010(5)(C).

Although the relevant statutes and regulations specify detailed hearing procedures before an award is made on an individual claim for compensation, no analogous requirements exist with respect to the payment calculation.  Instead, §§ 537.684.8 through .10 simply require the Division to make a payment calculation based on circumstances which apply equally to all approved claims. The statutes do not require the Division to consider the particulars of any individual claim; nor do the statutes allow claimants to have any input before a

14

payment determination is made. The Division's regulations are similar. *See* 8 CSR 50-8.010(7)(A) and (B).

The payment calculation was not a decision on a claim "heard" by the Division. While the right to be "heard" may not require a formal, on-the-record evidentiary hearing, it requires, at a minimum, that affected parties be given *some* opportunity to state their position on a contested issue. In its landmark decision in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court of the United States held that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (citation omitted). The Court made clear that an "opportunity to be heard" requires "notice of the case against [an affected party] and opportunity to meet it," "a meaningful opportunity to present their case," and "an effective process for asserting his claim prior to any administrative action." *Id.* at 348-49.

*Mathews*' definition of the term "heard" is consistent with dictionary definitions. "Heard" is the past tense of "hear." "Hear" is defined in the relevant sense as "to give a listening to legal arguments in; to give a legal hearing to," or "to take testimony from." https://www.merriam-webster.com/dictionary/hear.

Claimants were not "heard" with respect to the payment calculation in any meaningful sense – they were given no prior notice of, or opportunity to express a position concerning, the payment calculation. The payment determination is not based on the facts of any individual claim, but is instead a mathematical exercise which applies uniformly to all Claimants. Moreover, no record was created concerning the basis for the Division's calculation. Section 537.690.1 only requires a claimant to apply for Commission review of matters "heard" by the

Division; the statute also contemplates that Commission review will generally occur "on the basis of the evidence previously submitted in such case" before the Division. The fact that the payment calculation was not a matter "heard" by the Division confirms that § 537.690.1 is inapplicable here.

## C.

The regulations promulgated by the Division and by the Commission contemplate Commission review of the awards deciding individual claims, but _not_ of the global payment determination the Division makes in the following year.

The Division regulations governing the determination of individual claims make multiple references to potential review by the Labor and Industrial Relations Commission, and expressly require that claimants be notified of their right to seek such review:

> (F) If the claimant fails to appear for the evidentiary hearing at the date and time scheduled, the administrative law judge or legal advisor, in his or her sole discretion, . . . may dismiss the request for hearing with prejudice. . . . Such dismissal shall be deemed a final award for purposes of review by the Labor and Industrial Relations Commission.

> . . . .

> (H) The division shall, immediately upon issuance of the decision, send a copy thereof by first class mail, postage prepaid, to the claimant at the claimant's last known address or to the last known address of the claimant's attorney or other legal representative. The decision shall contain a notice advising the claimant of claimant's right to have the decision reviewed by the Labor and Industrial Relations Commission, and informing the claimant of the time for filing the petition for review.

16

(I)    A petition for review must be filed with the Labor and Industrial Relations Commission within thirty (30) days following the date of notification or mailing of such decision to the claimant, as provided by section 537.690.1, RSMo, and such petition for review shall be filed with the commission on a form provided for such purpose by the commission.

8 CSR 50-8.010(5).

Unlike the regulations governing individual claims determinations, the regulations governing the payment calculation simply direct the Division to make the calculation specified in §§ 537.684.8 and .9, and then mail payment to the relevant claimant.

The payments shall be made by check, payable to the claimant (or to such other person or persons as may be specified in the award), and shall be sent by first class mail, postage prepaid, to the claimant at the claimant's last known address or to the last known address of the claimant's attorney or other legal representative.

8 CSR 50-8.010(7)(C).

Notably, the Division's regulations concerning the payment of claims do not require that a claimant be informed if a proportionate reduction has been made to their payment amount because the "money in the fund" is less than the total amount of the approved claims; nor do the regulations require that claimants be advised of the basis for any such proportionate reduction. And significantly, the payment regulations do not require that a claimant be advised that they have the right to seek review by the Commission of any payment calculation. The notices received by Claimants were consistent with the regulations. The notices do not provide Claimants with the information necessary to determine the basis for the proportionate reduction in their

17

compensation payments; nor do the notices suggest that Claimants had a right to request any further administrative review.

The Commission's regulations governing applications for review in Fund cases similarly contemplate review _only_ of individual claim determinations. The Commission's regulations provide that "[a]ny party to a case involving tort victims' compensation may appeal the decision of the Division of Workers' Compensation by filing a petition with the commission within thirty (30) days following the date of notification or mailing of the decision, as provided by section 537.690, RSMo." 8 CSR 20-8.010(1). The regulation explains that "[a] form to be used in making the petition has been promulgated by the commission and is available upon request." _Id._

While the rule may not itself specify what "decisions" are subject to review, 8 CSR 20-8.010(1) refers to "the decision" in an individual case, in the singular. Further, the form promulgated by the Commission leaves no doubt that review is only available concerning an individual claims determination. The form recites that a claimant is "petition[ing] the Labor and Industrial Relations Commission for review of _the final decision made by an Administrative Law Judge_ of the Division of Workers' Compensation" in the claimant's case. (Emphasis added.) The Form asks the claimant to list the "specific reasons" why "_[t]he Administrative Law Judge's final decision_ is erroneous . . . ." (Emphasis added.) The form also advises claimants that "[t]he original Petition for Review must be filed with the Missouri Labor and Industrial Relations Commission within thirty (30) days from the date of _the final decision of the Administrative Law Judge._ § 537.690 RSMo." (Emphasis added.)

18

Other aspects of the Commission's regulations make clear that review is only contemplated for decisions by an ALJ after an evidentiary hearing.  The regulations specify that additional evidence will not be considered unless "the testimony or exhibits reasonably could not have been discovered or produced *at the hearing before the Division of Workers' Compensation*."  8 CSR 20-8.010(2)(A)(4) (emphasis added).  The Commission's regulations also admonish claimants that presentation of additional evidence before the Commission is discouraged:

> As a matter of policy, the commission is opposed to the submission of additional evidence except when it furthers the interests of justice.  Therefore, *all available evidence shall be introduced at the hearing before the administrative law judge*.

8 CSR 20-8.010(2)(B) (emphasis added).  Of course, with respect to the payment calculation, there is no "hearing before the Division of Workers' Compensation" or "before the administrative law judge" at which evidence <u>could</u> have been submitted.  And there is no "evidence" submitted before the initial payment determination is made; thus, no question arises concerning the submission of "additional" evidence.

"Rules promulgated by agencies 'are entitled to a presumption of validity and may not be overruled except for weighty reasons.'"  *Valley Park Props., LLC v. Mo. Dep't of Nat'l Resources*, 580 S.W.3d 607, 612 (Mo. App. E.D. 2019) (quoting *State ex rel. Mo. Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 602 (Mo. 2012)).  Here, the Commission's and the Division's regulations are consistent with the conclusion drawn from the plain language of § 537.690.1:  the payment calculation made by the Division in the year following an annual claims

period is _not_ "a decision of the division on a claim heard under the provisions of sections 537.675 to 537.693."

*    *    *    *    *

Claimants were not entitled, or required, to apply for review before the Labor and Industrial Relations Commission before filing the present lawsuit, and the circuit court erroneously dismissed their lawsuits for failure to exhaust an available administrative remedy.

**II.**

The circuit court also held that Claimants' suits were subject to dismissal because they had failed to establish any applicable waiver of sovereign immunity. We once again disagree.

In *Kubley v. Brooks*, 141 S.W.3d 21 (Mo. 2004), the Missouri Supreme Court drew a sharp distinction between "the doctrine of sovereign immunity from liability in tort," and "the separate, but related, doctrine that the sovereign cannot be sued without its consent." *Id*. at 29. Because this is not a tort case, the only question which arises in this case is whether the State entities have consented to be sued.

With respect to consent to suit, the Supreme Court has repeatedly held that a statute which provides that a particular agency can "sue or be sued" is sufficient to establish the State's consent to suits against that agency for non-tort claims. Thus, in *V.S. DiCarlo Construction Co. v. State*, 485 S.W.2d 52 (Mo. 1972), the Court stated that statutes providing that an agency may "sue and be sued in its official name" "are general enabling acts, conferring broad authority for those agencies to sue and be sued. They provide a continuing waiver of sovereign

20

immunity as to those agencies . . . ." *Id.* at 56. Similarly, in *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo. 1977), the Court stated that "there is no reason to . . . give to the words 'sue and be sued' any meaning other than the usual and ordinary one conveyed by the language used, which is that the entity in question may sue and be sued, without restriction as to kind of liability sought to be imposed." *Id.* at 230. Discussing *Jones*, the Court in *Kubley* explained that

> an enabling statute's provision that the agency can "sue and be sued" is sufficient to constitute a consent to suit other than in tort. Indeed, *Jones'* statements that the "sue and be sued" language constitutes a waiver of immunity from suit, although not of sovereign immunity in tort, simply reiterated settled law.

141 S.W.3d at 30. And just last year in *Ramirez v. Missouri Prosecuting Attorneys' Retirement System*, 694 S.W.3d 432 (Mo. 2024), the Supreme Court noted that (unlike in *Kubley*) the statute at issue did "not contain the 'sue and be sued' language previously found sufficient to amount to express consent to waive sovereign immunity for a non-tort claim." *Id.* at 437 n.5.

In this case, statutes expressly provide that the Division of Workers' Compensation, and the Labor and Industrial Relations Commission, may "sue and be sued in [their] official name[s]." *See* § 287.590 (regarding Division); § 286.060.1(1) (regarding Commission). The provision authorizing suit against the Division is particularly significant here, since it is *the Division's* actions which Claimants challenge. Section 537.684.8 specifically authorizes *the Division* to make the payment calculation, and §§ 537.678.1 and .2 empower *the Division* "to determine and award compensation" from the Fund, using money appropriated *to the Division*.

21

The Division argues that the prior cases reading "sue and be sued" statutes to authorize suits against State agencies must be limited to suits seeking to enforce contractual or quasi-contractual rights, or to recover monies paid by the plaintiff to a State agency. But we have previously rejected the distinction the Division advocates. In *Gerken v. Sherman*, 351 S.W.3d 1 (Mo. App. W.D. 2011), we held that a "sue and be sued" clause waived the sovereign immunity of the Family Support Division of the Department of Social Services with respect to an award of prejudgment interest based on the Division's prior underpayment of benefits from the blind pension fund. *Id.* at 11-12. In doing so, we relied on *Kubley*'s holding that, "in non-tort claims, '[s]tatutory authority to sue and to be sued is sufficient consent to suit to waive the doctrine of immunity of the sovereign from suit without its consent.'" *Id.* (quoting *Kubley*, 141 S.W.3d at 31). We specifically rejected the Division's claim that the principles recognized in *Kubley* and related cases were inapplicable because "the actions at issue were contractual in nature and in the instant case, 'the obligation is based on a statute . . . .'" *Id.* at 12; *see also Goines v. Mo. Dep't of Soc. Servs.*, 364 S.W.3d 684, 687 (Mo. App. W.D. 2012) (relying on *Kubley*, and the presence of a "sue and be sued" statutory provision, to hold that the State had waived sovereign immunity against an award of attorney's fees in a suit seeking declaratory and injunctive relief to remove an individual's name from the Child Abuse and Neglect Registry).

Besides the fact that we have previously refused to apply the *Kubley* principle in the narrow manner which the Division advocates, we also note that in *Jones*, the Missouri Supreme Court expressly stated that a "sue and be sued"

22

provision waived a State agency's immunity from suit "*without restriction as to kind of liability sought to be imposed.*"  557 S.W.2d at 230 (emphasis added).  And *Kubley* stated that *Jones*' discussion of the effect of "sue and be sued" clauses "simply reiterated settled law."  *Kubley*, 141 S.W.3d at 30.  We cannot limit the effect of "sue and be sued" clauses to contractual or quasi-contractual actions, when the Supreme Court has held that such clauses reflect the State's consent to suit "without restriction as to [the] kind of liability sought to be imposed."  If the effect of "sue and be sued" clauses is to be restricted, that restriction must come from the Supreme Court, not this Court.

The Division also argues that, rather than relying on *Kubley*, we should instead rely on *Kleban v. Morris*, 247 S.W.2d 832 (Mo. 1952), and *Gas Service Co. v. Morris*, 353 S.W.2d 645 (Mo. 1962).  *Kleban* and *Gas Service* held that, where "the statute permitting suit for tax refunds limited the procedures by which such refunds could be sought, the State's consent to suit extended only to suit by the methods the tax statutes provided."  *Kubley*, 141 S.W.3d at 31.  Thus, under *Kleban* and *Gas Service*, where a statute authorizes suit against the State in a particular situation, the State's consent to suit is limited to the procedures specified in the statute.  As we have explained in § I above, however, § 537.690.1 is inapplicable here, and therefore Claimants were not limited to suing the Division in the manner specified in § 537.690.1.

Because § 537.690.1 is inapplicable here, and no other specific statutory avenue exists for obtaining administrative or judicial review of the Division's payment calculation, Claimants were entitled to seek judicial review of the payment calculation under § 536.150.1, which provides in relevant part that,

23

[w]hen any administrative officer or body existing . . . by statute . . . shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person, . . . and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action . . . .

Claimants' suit – seeking a declaratory judgment that the Division's payment calculation is unlawful and inconsistent with the relevant statutes – can properly be construed as a petition for judicial review under § 536.150.1. *See*, *e.g.*, *PMS 4583 LLC v. City of New Melle*, 639 S.W.3d 10, 18-20 (Mo. App. E.D. 2021). Notably, the Missouri Supreme Court has held that § 536.150.1 itself constitutes a waiver of the State's sovereign immunity. *St. Louis Cnty. v. State*, 424 S.W.3d 450, 454 n.3 (Mo. 2014); *see also St. Louis Cnty. v. State*, 482 S.W.3d 842, 848-49 (Mo. App. W.D. 2016).

In its briefing the Division also supports its sovereign immunity arguments by citing to the final sentence of § 537.684.9, which states that "[a]ny award pursuant to this subsection that cannot be paid due to a lack of funds appropriated for payment of claims of uncompensated tort victims shall not constitute a claim against the state." The Division's argument misconceives the nature of Claimants' claims. Claimants do not seek a judgment ordering the Division to make payments beyond the amount appropriated by the General Assembly for the 2024 Fiscal Year; nor do Claimants seek an order requiring the General Assembly to appropriate additional monies for payment of approved claims. Instead, Claimants only seek a declaratory judgment that their claims cannot be extinguished based on the amount of money appropriated for Fund payments in Fiscal Year 2024. To the extent the 2024 appropriation is

24

insufficient to pay the proper amount of Claimants' approved claims, Claimants seek a declaration that the unsatisfied portion of their awards will not be extinguished, but will remain outstanding until sufficient money is appropriated in the future to pay the unpaid awards. Claimants do not seek to assert "a claim against the state" for any unpaid portion of their awards, and the final sentence of § 537.684.9 is accordingly inapplicable here.

The circuit court erred by dismissing Claimants' suit on the basis of sovereign immunity.

## III.

Having concluded that Claimants' suits are not barred by sovereign immunity or by the administrative exhaustion doctrine, we now turn to their claim that the Division miscalculated the amount of their awards which were entitled to compensation.

As discussed in our fact statement, claims payments are governed by §§ 537.684.8 and .9, which provide:

> 8. For payment of all claims from the fund, the division shall determine the aggregate amount of all awards made on those claims filed during an annual claims period. Such determination shall be made on or before the thirtieth day of June in the next succeeding year. If the aggregate value of the awards does not exceed the total amount of money in the fund, then the awards shall be paid in full on or before the thirtieth day of September in the next succeeding year. If the aggregate value of the awards does exceed the total amount of money in the fund, then the awards shall be paid on a pro rata basis on or before the thirtieth day of September in the next succeeding year.

> 9. If there are no funds available, then no claim shall be paid until funds have accumulated in the tort victims' compensation fund and have been appropriated to the division for payment to

uncompensated tort victims. When sufficient funds become available for payment of claims of uncompensated tort victims, awards that have been determined but have not been paid shall be paid in chronological order with the oldest paid first, based upon the date on which the application was filed with the division. Any award pursuant to this subsection that cannot be paid due to a lack of funds appropriated for payment of claims of uncompensated tort victims shall not constitute a claim against the state.

Sections 537.684.8 and .9 are ambiguous. "'A statute is ambiguous when its plain language does not answer the current dispute as to its meaning." *BASF Corp. v. Dir. of Revenue*, 392 S.W.3d 438, 444 (Mo. 2012) (quoting *Derousse v. State Farm Mut. Auto. Ins. Co.*, 298 S.W.3d 891, 895 (Mo. 2009)).

Section 537.684.8 provides that the Division must determine the proportion of approved claims to pay based on "the total amount of money in the fund." This phrase is not otherwise defined, although its interpretation lies at the heart of this litigation.

Other phrases used in the Fund statutes would suggest that "the total amount of money in the fund" should be read to refer to the total Fund balance, rather than the amount appropriated to the Division in any particular year for payment of claims. Thus, the first sentence of § 537.684.9 appears to distinguish between "funds [that] have accumulated in the tort victims' compensation fund" and funds that "have been appropriated to the division for payment of uncompensated tort victims." Other Fund statutes seem to draw a similar distinction: they refer to amounts "deposited into the tort victims' compensation fund," § 537.675.5, or monies "received by the tort victims' compensation fund," § 537.678.1, and appear to distinguish the monies "received by" and "deposited into" the Fund from monies "appropriated to the division of workers' compensation to assist uncompensated tort victims." *Id*.

Claimants argue – with some force – that "the total amount of money in the fund" must refer to the monies which have "accumulated in," been "deposited into," and been "received by" the Fund – in other words, the total Fund balance. Claimants note that the General Assembly specifically referred to money "*appropriated to the division of workers' compensation*" when it intended to refer to that appropriated amount.

Adopting Claimants' interpretation of "the total amount of money in the fund" creates its own interpretive difficulties, however. Section 537.684.8 contemplates that, after the total amount of approved claims have been compared to "the total amount of money in the fund," "then the awards *shall be paid* ["in full" or "on a pro rata basis"] on or before the thirtieth day of September in the next succeeding year." (Emphasis added.) Thus, § 537.684.8 requires that, where there is "money in the fund," awards must be paid by September 30 of the year following the annual claims period. But if, as here, the total Fund balance is *greater than* the amount of money appropriated by the General Assembly for payment of claims, then the available funds will not be sufficient to pay all claims – even after being discounted – before September 30 of the succeeding year. While the second sentence of § 537.684.9 sets forth a procedure for dealing with unpaid claims from earlier periods, it is arguable that the entirety of § 537.684.9 is only applicable "[i]f there are _no_ funds available" (as stated in the subsection's introductory language). (Emphasis added.) It could be argued that § 537.684.9 is _not_ applicable in a situation like the present one, where funds _are_ available, but those funds would be insufficient to fully satisfy all (discounted) awards if Claimants' payment calculation is adopted.

Claimants' reading of "the total amount of money in the fund" to refer to the total Fund balance also ignores the fact that the total amount of money received by, or deposited into, the Fund is _not_ intended solely for the compensation of tort victims. Instead, § 537.678.1 specifies that

> *[s]eventy-four percent* of all payments received by the tort victims' compensation fund regardless of source or designation shall, upon appropriation, be appropriated to the division of workers' compensation to assist uncompensated tort victims and shall be used for no other purpose.

(Emphasis added.) The *other* twenty-six percent of Fund receipts, as well as "all interest accruing on the principal" in the Fund, "shall be transferred to the basic civil legal services fund established in section 477.650." § 537.675.5. Claimants do not explain why the General Assembly would dictate that the proration calculation be based upon the *total Fund balance*, when only *seventy-four percent of that balance* could ever be used to compensate tort victims.

Claimants' reading of § 537.684.4 would also result in payment calculation questions in succeeding years. For example, assume in Year 1 that there are $200 million in approved claims, $100 million in the Fund, but an appropriation of only $50 million. According to Claimants, their claims would be discounted by 50% (based on the total Fund balance), rather than by 75% (based on the amount of the appropriation). Only $50 million would actually be paid to satisfy the approved Year 1 claims, however; Claimants propose that approved claims would be paid in full until the money ran out, in chronological order based on the date on which individual claims were filed. The Fund balance would be reduced to $50 million (corresponding to the $50 million in discounted claims from Year 1 which remain unpaid). Assume that in Year 2 there were $100 million in new

28

approved claims, no additional deposits into the Fund, and an appropriation of $25 million. According to Claimants' argument, the Year 2 claims would be discounted based on the $50 million balance in the Fund – even though that $50 million was already "spoken for" to pay the remaining (discounted) Year 1 claims.

"Ambiguities in statutes are resolved by determining the intent of the legislature and by giving effect to its intent if possible." *BASF*, 392 S.W.3d at 444 (quoting *Derousse*, 298 S.W.3d at 895); *accord, Aquila Foreign Qualifications Corp. v. Dir. of Revenue*, 362 S.W.3d 1, 4 (Mo. 2012).

> When a statute's language is ambiguous . . ., extrinsic matters such as the statute's history, surrounding circumstances, and objectives to be accomplished through the statute may be considered.

*Anderson ex rel. Anderson v. Ken Kauffman & Sons Excavating, L.L.C.*, 248 S.W.3d 101, 109 (Mo. App. W.D. 2008) (*en banc*) (citation omitted). An ambiguous statute "should be given a sensible construction considering the objective the legislature sought to accomplish and with an eye on resolving the problem addressed therein." *Burrell ex rel. Schatz v. O'Reilly Auto., Inc.*, 175 S.W.3d 642, 652 (Mo. App. S.D. 2005) (citation omitted); *see also State ex rel. St. Louis Charter Sch. v. State Bd. of Educ.*, 438 S.W.3d 437, 443 (Mo. App. W.D. 2014) (an ambiguous statute "should be given a reasonable reading and construed consistent with the legislature's purpose in enacting it" (cleaned up)).

In this case, we conclude that the most sensible reading of "the total amount of money in the fund" is to construe the phrase to refer to the money appropriated by the legislature to the Division in a particular year for the payment of tort victims' claims. First and foremost, this is the only reading which would allow the Division to comply with the directive of § 537.684.8 that "the

awards shall be paid [either "in full" or "on a pro rata basis"] on or before the thirtieth day of September in the next succeeding year."

In addition, the statute contains *some* textual support for reading "the total amount of money in the fund" as equivalent to the funds *presently available* to pay compensation claims. Although the statutory language is not entirely clear, it appears that §§ 537.684.8 and .9 contemplate three scenarios, with three different outcomes (payment in full; payment *pro rata*; or no payment). Sections 537.684.8 and .9 say:

 (1) "*If the aggregate value of the awards does not exceed the total amount of money in the fund*, then the awards shall be paid in full . . . ."

 (2) "*If the aggregate value of the awards does exceed the total amount of money in the fund*, then the awards shall be paid on a pro rata basis . . . ."

 (3) "*If there are no funds available*, then no claim shall be paid . . . ."

It appears that the legislature intended these three scenarios to exhaustively describe the situations which might arise, and to be mutually exclusive of one another. On this understanding, the phrase "the total amount of money in the fund" should be interpreted as equivalent to the "funds available" for payment of claims.

It is also clear from the Fund statutes, and from constitutional principles, that monies are only available to actually pay compensation to tort victims when the money is actually *appropriated by the legislature* for that purpose. *See* § 537.678.1 (specifying that monies in the fund "shall, upon appropriation, be appropriated to the division of workers' compensation to assist uncompensated tort victims and shall be used for no other purpose"); *Fust v. Att'y Gen. for State*

30

*of Mo.*, 947 S.W.2d 424, 430 (Mo. 1997) ("The Fusts are correct in arguing that an appropriation is necessary for the expenditure of any money in the tort victims' compensation fund."). Using the appropriated amount to determine how much of a claim is paid makes sense, since only that appropriated amount has actually been authorized for use to compensate tort victims.

In addition, the timeline for determination and payment of claims against the Fund is designed with the legislative appropriation process in mind. The vast majority of claims filed during a particular calendar year will be finally decided by early in the next calendar year, while the General Assembly is in session. The legislature will thus be able to make appropriations decisions with knowledge of the amount of approved claims attributable to the prior annual claims period. The Division is then required to make its payment calculation, and to make claims payments, by September 30 of the year succeeding the annual claims period – when the amount of the General Assembly's appropriation to the Division will be known.

It is significant that Fund balances may vary wildly from year to year, depending on the happenstance of when particularly large punitive damage judgments become final and are collected. The timing of these potentially large deposits into the Fund may be entirely fortuitous, and may have nothing to do with the needs of uncompensated tort victims. The evidence in this case provides a prime example. According to the Claimants' evidence at trial, during the five-year period between June 2018 and June 2023, the balance in the Fund varied from a low of $673,823.50 on June 28, 2019, to a high of $484,325,841.14 on June 30, 2021 – an increase of almost 72,000% in a two-year period. The

31

massive increase in the Fund's balance between 2019 and 2021 was attributable to a single multi-plaintiff personal-injury judgment in St. Louis County.[2] Notably, during the same time period, the total annual amount of the approved claims increased by only 190%. This illustrates that the total Fund balance can vary significantly, and entirely independently from the needs of uncompensated tort victims.

By allowing the General Assembly to control the distribution of money in the Fund through the appropriations process, the legislature can take account of the varying balances in the Fund, and can make judgments as to when Fund balances should be expended, and when portions of the Fund balance should be held in reserve for future uncompensated tort victims. The need for such judgments was particularly acute following the Fund's receipt of the historic, "once-in-a-lifetime" payment in 2021. The General Assembly evidently concluded that the appropriate policy choice was to make substantial appropriations for payments to current Fund claimants, but to reserve some portion of the massive 2021 infusion for future years. Given the unpredictable and fluctuating Fund balances, allowing the General Assembly to regulate the disbursement of monies from the Fund furthers the Fund's underlying purpose: to provide some meaningful measure of compensation to the largest number of otherwise-undercompensated tort victims.

---

[2] *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. E.D. 2020), *cert. denied*, 141 S. Ct. 2716 (2021); Rebecca Rivas, "Missouri legal aid agencies receive $126M windfall from Johnson & Johnson talc liability judgment," MISSOURI INDEPENDENT (June 9, 2022); Jessica Shumaker, "Tort Victims' fund gets $480M from talc judgment," MO. LAWYERS WEEKLY (June 29, 2021).

Notably, Claimants argue for an interpretation of the relevant statutes which would exclude the General Assembly entirely from the decisions when, and how much, uncompensated tort victims will be paid. According to the *Jones* plaintiffs,

> ***the actual words of §537.684 implicitly but unequivocally exclude the legislature from the analysis***. State Respondents' approach allows the General Assembly to manipulate who receives payments from the TVCF, and how much those payments are. ***Plaintiffs' approach***, by contrast, ***keeps the legislature out of the mix***. ***The calculation is based not on legislative choices in any given year, but on the independent acts of third parties: litigants in cases that produce the money that flows into the TVCF***. Certainly, in some years tort victims will receive more than they do in other years. The design of the TVCF allocation method recognizes and embraces that. But ***the design of the TVCF does not contemplate legislative interference*** that can dictate in which years there are payments, and thus dictate who will receive payments.

*Jones* Plaintiffs' Reply Br. at 12 (emphasis added).

Claimants' argument proceeds on the assumption that the legislature may "manipulate" distributions from the Fund, and "interfere" with the Fund's administration, in a malevolent attempt to deny uncompensated tort victims their due. Claimants advocate a payment process which would be controlled by the actions of litigants, lawyers, and courts in unrelated cases, rather than by the General Assembly. We recognize that there may be times (such as the 2022 annual claims period) where the legislature chooses to appropriate less than the entire balance in the Fund to current claimants, in order to reserve money in the Fund for payments to claimants in future years. But we refuse to attribute evil motives to the General Assembly's appropriations decisions. Instead, in

33

interpreting the Fund statutes and the effect of the legislature's annual appropriations, "'it is assumed that the legislature's enactment of a statute is meant to serve the best interests and welfare of the general public.'" *Neil v. St. Louis Cnty.*, 688 S.W.3d 268, 274 (Mo. App. E.D. 2024) (quoting *State v. Nash*, 339 S.W.3d 500, 508 (Mo. 2011)). In the face of an ambiguous statute, it is reasonable to adopt the construction which gives the General Assembly authority over the distribution of State funds. "The constitution vests th[e] power of the purse in the general assembly for good reason. The legislative branch is historically the branch of government closest to the people and the branch that most directly represents the citizens of this state." *Rebman v. Parson*, 576 S.W.3d 605, 609 (Mo. 2019).

For the foregoing reasons, we conclude that the Division properly prorated awards for claims filed during the 2022 annual claims period by reference to the $150 million appropriated by the General Assembly to the Division for payment of claims of uncompensated tort victims in Fiscal Year 2024.

## IV.

Claimants argue that the circuit court erred by excluding evidence of the Division's payment calculations in prior claims years. According to Claimants, the Division's earlier proration calculations were based on the total balance in the Fund, rather than the amount appropriated for compensation payments. Claimants contend that this evidence of an earlier, inconsistent administrative practice was relevant both to counter the Division's claim that its interpretation of the Fund statutes was entitled to deference, and to support Claimants'

assertion that the Division had unlawfully adopted an unpromulgated rule changing its past interpretation of the relevant statutes.

The evidence proffered by Claimants concerning the Division's past payment calculations does not reveal any consistent payment calculation methodology. According to Claimants' evidence, in the 2017 annual claims period, the total Fund balance, and the legislative appropriation, both exceeded the total amount of approved claims; yet the Division still prorated the approved claims, and only paid 35% of the approved amounts. The Division paid claims approved in 2018 and 2019 together in 2020, paying 44% of those claims; the 44% proration factor does not appear to correspond to *either* the total monetary balance in the Fund, or the amount of the legislative appropriations, in the two relevant years. In 2020, the Division delayed making payments on approved claims, even though the legislative appropriation would have supported paying 28.46% of the approved claims; the Division instead paid the entire amount of the approved 2020 and 2021 claims together in 2022, when *both* the total appropriations, and the total Fund balances, exceeded the total amount of the approved claims.

Given the lack of consistency in the Division's payment calculations in prior years, and in the 2022 annual claims period, we have given no consideration to the administrative construction of the Fund statutes in our statutory interpretation analysis. *See Foremost Dairies, Inc. v. Thomason*, 384 S.W.2d 651, 659 (Mo. 1964) ("in view of the difficulties encountered by the commissioner [in reaching a consistent statutory construction], we can give no weight to his final interpretation of the Act as embodied in Rule 11"). The circuit

court's refusal to consider the evidence concerning past payment calculations cannot establish reversible error, when that evidence would not alter the statutory interpretation analysis.

Claimants contend that their petitions asserted an "unpromulgated rule" argument – namely, a claim that the Division had adopted a statewide policy concerning the prorated payment of awards from the Fund without going through formal rulemaking procedures. Yet Claimants can cite to nothing in their petitions which asserts such a claim, apart from their allegations that the Division's payment calculation was – in Claimants' view – inconsistent with the relevant statutes. A claim that an agency's interpretation of a statute is erroneous is not the same as a claim that an agency has adopted a policy of general applicability without invoking formal rulemaking procedures. The circuit court did not err in finding that Claimants had failed to plead an "unpromulgated rule" claim.

## V.

The *Jones* plaintiffs also challenge the circuit court's denial of their motion for class certification. The circuit court denied the motion for class certification in the concluding footnote of its judgment, which stated that "[a]ll motions in this case pending before the Court at the time of this judgment and not expressly addressed herein are now denied."

In its brief as respondent, the Division cites to *Ressler v. Clay County*, 375 S.W.3d 132 (Mo. App. W.D. 2012), which held that Missouri's rules of civil procedure "allow courts, in appropriate cases, to address the merits of an individual claim before addressing the issue of [class] certification." *Id.* at 139.

36

The *Jones* plaintiffs offered no response in their reply brief. Given that we have affirmed the circuit court's merits ruling, we deny the *Jones* plaintiffs' Point concerning class certification without further discussion.

## Conclusion

Although we reject the circuit court's analysis of the sovereign immunity and administrative exhaustion issues, we affirm the judgment to the extent that it holds that the Division's payment calculation was consistent with the relevant statutes.

_____
Alok Ahuja, Judge

Judge Janet Sutton concurs.
Judge Mark D. Pfeiffer dissents in a separate opinion.



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

LOUISE JONES, et al.,           )
                                 )
            Appellants,    )
                                 )    WD87295
v.                               )    (Consolidated with WD87303
                               )    and WD87351
                               )
MISSOURI LABOR AND        )    OPINION FILED:
INDUSTRIAL RELATIONS     )    August 5, 2025
COMMISSION, et al.,        )
                               )
            Respondents.   )

## Dissenting Opinion

Because the majority opinion today (1) ignores the plain meaning of the statutory remedy directive of our General Assembly for a statutorily created cause of action and (2) permits a claim for damages against the State without a corresponding waiver of the State's sovereign immunity, I respectfully dissent.

Tort victims' compensation fund ("Fund") claims are not a common law right; instead, they are claims created by the General Assembly and codified by statute. "It is well-settled that when the General Assembly creates or replaces the cause of action, it is free to define what—and to what extent—remedies are available under that cause of

action." *Ordinola v. Univ. Physician Assocs.*, 625 S.W.3d 445, 449 n.7 (Mo. banc 2021); *accord Sanders v. Ahmed*, 364 S.W.3d 195, 203 (Mo. banc 2012) ("The legislature has the power to define the remedy available if it creates the cause of action."); *Est. of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 376 (Mo. banc 2012) (recognizing that the legislature has the authority to choose what remedies will be permitted under a statutorily created cause of action).

And, "where a new right or means of acquiring it are given, and an adequate remedy for violating it is given, in the same statute, then the injured parties are confined to the statutory remedy." *Everett v. Clinton Cnty.*, 282 S.W.2d 30, 34 (Mo. 1955) (quoting *Hickman v. Kansas City*, 25 S.W. 225, 226 (Mo. 1894)). "Where a code or statute creates a new right or liability that did not exist at common law or under prior statutes, and also provides a specific remedy for the enforcement thereof, as a general rule such statutory remedy is exclusive." *Gales v. Weldon*, 282 S.W.2d 522, 529 (Mo. 1955). "Of course, if the plaintiffs had an adequate statutory remedy, the procedure prescribed therefor would be exclusive." *Evans v. Roth*, 201 S.W.2d 357, 360 (Mo. banc 1947).

The statutory remedy for Fund claimants who disagree with a decision of the Division on their claim is as follows:

> Any of the parties to a decision of the division on a claim heard under the provisions of sections 537.675 to 537.693 may, within thirty days following the date of notification or mailing of such decision, file a petition with the labor and industrial relations commission to have the decision reviewed by the commission. The commission may allow or deny a petition for review. If a petition is allowed, the commission may affirm, reverse or set aside the decision of the division on the basis of the evidence previously submitted in

such case or may take additional evidence or may remand the matter to the division with directions.

§ 537.690.1. Following the Commission's review, a party may seek judicial review:

Any party who is aggrieved by a final decision of the commission entered pursuant to the provisions of subsections 1 and 2 of this section may seek judicial review thereof by appealing, within twenty days of a final decision to the appellate court having jurisdiction in the area where the appellant resides. In such proceedings the attorney general, on behalf of the tort victims' compensation fund, shall defend the decision of the commission. The commission shall not be a party in such actions.

§ 537.690.3.

Here, the Division made two relevant "decisions" on each of the subject Fund claims. First, it issued a decision on the base amount of the award for each claim ("Award Decision"). Second, it issued a decision on the percentage of each award that each claimant would receive in compensation from the Fund ("Payment Decision"). Each "decision" was mailed to each claimant as a separate, personalized notification to each claimant.

Each of these "decisions" of the Division relate to "a claim heard under the provisions of sections 537.675 to 537.693." Thus, according to the statutory remedy path, when a Fund claimant disagrees with a "decision" of the Division, it must petition the Commission for administrative review. And, if the Fund claimant disagrees with the ruling of the Commission, the Fund claimant is then entitled to appeal the Commission's ruling to the Missouri Court of Appeals. It's that simple.

But, instead of seeking administrative review by the Commission, the Fund claimants here *sued the Commission*. To be clear, the Commission has not, as of yet,

3

issued any ruling on any complaint by any of the Fund claimants in question. The

Commission simply has not "acted" in any fashion; and yet, the Commission is a *named*

*party* in a lawsuit for *money damages*[1] filed in *a circuit court—even though the circuit*

*courts of Missouri are listed nowhere in the exclusive statutory remedy to Fund*

*claimants.*

The majority also ignores the case precedent stating that, "[t]he interpretation and

construction of a statute by an agency charged with its administration is entitled to great

weight." *Tuttle v. Dobbs Tire & Auto Ctrs., Inc.*, 590 S.W.3d 307, 312 n.12 (Mo. banc

2019) (quoting *Mercy Hosps. E. Cmtys. v. Mo. Health Facilities Rev. Comm.*, 362

S.W.3d 415, 417 (Mo. banc 2012)).[2] Here, in this appeal, the Commission and its

---

[1]     Though the Fund claimants *package* their claim for relief as one for *declaratory* relief, the practical ramification of the relief sought is that they are seeking a declaration that additional *money* be paid to the Fund claimants. Belying any suggestion that this suit is one for *declaration* only, the Fund claimants also seek monetary damages for attorney's fees from "the common fund or common benefit," which has no relevance to the statute they allegedly seek *declaration* about. In short, this lawsuit is about *money* damages, and any suggestion to the contrary places form above substance. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 668-69 (1974) (re-casting a claim for equitable relief against a state official, which would not have been barred by the Eleventh Amendment, as a claim for damages against the state itself, which was barred by the Eleventh Amendment, where the requested relief was "in practical effect indistinguishable in many aspects from an award of damages against the State").

[2] Though the agency interpretation is entitled to "great weight," it is also axiomatic that "this Court exercises independent judgment and must correct erroneous interpretations of law." *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 164 (Mo. banc 2005) (citing to *Burlington N. R.R. v. Dir. of Revenue*, 785 S.W.2d 272, 273 (Mo. banc 1990)). This is consistent with the recent opinion of the Supreme Court of the United States in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) (holding that courts should provide great—but not conclusive—weight to agency interpretations while reaffirming the primacy of the courts in reaching a final, independent decision on statutory interpretation), which overruled *Chevron, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (holding that courts are to afford binding

4

commissioners, the Department and its director, and the Division and its director—within their special administrative agency expertise—have all affirmatively represented in their appellate briefing to this Court that the administrative review procedure set forth in section 537.690 is applicable to the Division's Payment Decisions awarding a *pro rata* payment of the respective awards to each individual Fund claimant.[3]

"The doctrine of exhaustion of administrative remedies requires an aggrieved party to seek available administrative remedies before courts will act. This doctrine is well established, is a cardinal principle of practically universal application, and must be borne in mind by the courts in construing a statute providing for review . . . ." *State ex rel. Jackson Cnty. v. Chamberlain*, 679 S.W.3d 463, 465 (Mo. banc 2023) (citations omitted) (quoting *Sperry Corp. v. Wiles*, 695 S.W.2d 471, 472 (Mo. banc 1985)).

> The purpose of the exhaustion of remedies doctrine is to preserve the efficiency in the relationships between agencies and the courts. *Premium Standard Farms, Inc. v. Lincoln Twp.*, 946 S.W.2d 234, 237 (Mo. banc 1997). Agencies have a special expertise. *Id.* A factual record can be more fully developed by pursuing the designated channels for relief with the agency, or a matter may be resolved by the agency, rendering review by the court unnecessary. *Id.* In addition, the exhaustion of remedies doctrine

---

deference to agency interpretations of statutory provisions relating to the subject agency where the statute is ambiguous and the agency's interpretation is reasonable).

[3] These agency parties have also conceded at oral argument that in the Payment Decision letters, the Division failed to communicate the mandatory notice required by 8 CSR-8.010(5)(H) that each Fund claimant was entitled to administrative review by the Commission if the claimant disagreed with the Payment Decision. As such, the agency parties conceded at oral argument that they would be fairly subject to a tolling argument by the Fund claimants should they wish to proceed with administrative review to the Commission. *See Mo. Nat'l Educ. Ass'n v. Mo. State Bd. of Mediation*, 695 S.W.2d 894, 897 (Mo. banc 1985) (concluding that the failure of an agency to comply with its own rules may invalidate its actions when the violation results in prejudice). In other words, the Fund claimants are *not* without a statutory remedy at this time.

is rooted in policy considerations designed to encourage agencies to correct their own errors and to compile the record for purposes of judicial review. *Farm Bureau Town & Country Ins. Co. of Mo. v. Angoff*, 909 S.W.2d 348, 352 (Mo. banc 1995).

*Coleman v. Mo. Sec. of State*, 313 S.W.3d 148, 154 (Mo. App. W.D. 2010).

Appellants (hereinafter "Fund claimants") submit two arguments for why they are not subject to dismissal for failure to exhaust their administrative remedies. Neither have merit.

First, Fund claimants argue that the Division's Payment Decision on the *pro rata* payment reduction of all Fund claim awards falls outside of the statutory provision providing for administrative review, and therefore, they had no administrative remedy available to exhaust. Fund claimants contend that the Division's *pro rata* calculation is a global decision not predicated on the specific facts of each individual claim and is, thus, not a decision *on a claim*. I disagree.

While the mathematical calculation of the *pro rata* multiplier is a claim decision predicated on the total amount of awards and the total amount of money appropriated by the legislature available to pay those awards, that multiplier calculation is then applied by the Division *to each individual award*, and each claimant is notified of the reduction *as applied to his or her individual claim*. Thus, the *pro rata* reduction amounts to *a decision on each individual claim*, which falls within the plain language of section 537.690.

Furthermore, section 537.690 broadly encompasses any decision on a claim made pursuant to sections 537.675 through 537.693. Since section 537.684.8-.9 (*pro rata* statutory calculation formula) is within the umbrella of sections covered by the exclusive

6

remedy in section 537.690, a decision relating to a claim by the Division pursuant to section 537.684 is plainly intended to be subject to the administrative review provided for in section 537.690.

For their second argument relating to exhaustion of administrative remedies, Fund claimants assert that even if the challenged *pro rata* determination is subject to administrative review under section 537.690, they were nonetheless not required to exhaust this administrative remedy because they bring a purely legal challenge to the Division's Payment Decision. They further argue that the Commission cannot provide an adequate remedy because it has no authority to review purely legal issues. Again, I disagree.

Fund claimants are correct that "[e]xhaustion of administrative remedies is not required when an issue 'poses *no factual questions or issues* requiring the special expertise within the scope of the administrative agency's responsibility, but instead proffers only questions of law clearly within the realm of the courts.'" *LO Mgmt., LLC v. Off. of Admin.*, 658 S.W.3d 228, 238 (Mo. App. W.D. 2022) (emphasis added) (quoting *Premium Std. Farms*, 946 S.W.2d at 238). However, I do not agree that Fund claimants' suit raises only a question of law; instead, it raises a *mixed question* of law and fact.

Fundamentally, Fund claimants allege the Division erred in reaching its decision on the *pro rata* payment reduction of their awards and now seek to receive the correct award amount that they are legally entitled to. The explanation Fund claimants received for the *pro rata* payment reduction came in the Payment Decision to each Fund

7

claimant, which stated: "As the aggregate value of the awards exceeds the total amount of money in The Fund, the awards shall be paid on a *pro-rata* basis. [Section 537.684.8(2)]. Therefore, each claim is being paid at 40% of its full value."

Thus, the Division reached its Payment Decision by: (1) interpreting section 537.684.8 to determine the calculation to perform; (2) finding the aggregate value of the final awards for the 2022 claims year; (3) finding the relevant value of the amount of funds available to pay the awards; and (4) dividing the funds available to pay the awards by the amount of funds available to determine the *pro rata* multiplier. Although the first component identified is purely an issue of statutory interpretation, the remaining components are *factual matters that are within the agency's expertise*.

Because the provided explanation in the Division's Payment Decision does not detail the full scope of the relevant factual findings, the explanation leaves open the possibility that any of the four components could have been conducted erroneously: the Division might have misinterpreted section 537.684.8; *or* it might have made a mistake in its calculation; *or* it might have made a mistake in identifying the proper figures to use in its calculation.

If Fund claimants had sought administrative review before the Commission, the Commission may have concluded, upon reviewing a record fully developed by both Fund claimants and the Division, that the Division made a factual error, not a legal error, rendering construction of section 537.684.8 unnecessary for Fund claimants to receive relief.

8

Irrespective, we should decline to prematurely intervene and deny the Commission the opportunity to make the initial determination after the Commission could have required the parties to develop a full record regarding the Division's Payment Decisions relating to each of the Fund claimants. *See LO Mgmt.*, 658 S.W.3d at 239 ("[T]he legislature has vested the responsibility of making the initial determination . . . with [the agency] and prescribed the administrative procedure for doing so. [Appellants'] attempt to take this decision away . . . and bypass the administrative procedure entirely by seeking relief first from the court prematurely interferes with agency processes, deprives [the agency] of an opportunity to correct its own errors . . . and deprives the parties and the courts of the benefit of [the agency's] experience and expertise in applying the criteria . . . in making its decision.").[4]

---

[4] Further, in performing its statutorily itemized administrative review of the Division's Payment Decision, the Commission also has the authority to reach legal conclusions based on its application of law to the facts before it—as it has done countless times in reviewing the initial decisions of administrative law judges in workers' compensation cases. Of course, the Commission's interpretation and application of statutes will be subject to *de novo* review by Missouri's appellate courts if judicial review were to be sought in such a scenario. *E.g., Greer v. Treasurer of Mo.*, 475 S.W.3d 655, 664 (Mo. banc 2015) ("This Court is not bound by the commission's interpretation and application of the law, and no deference is afforded to those determinations." (citing *Gervich v. Condaire, Inc.*, 370 S.W.3d 617, 620 (Mo. banc 2012))); *Treasurer of Mo. v. Majors*, 506 S.W.3d 348, 352 (Mo. App. W.D. 2016) ("Where a Commission's decision is based on its interpretation and application of the law, we review the Commission's conclusions of law and its decision *de novo*.").

Thus, had the Fund claimants petitioned the Commission for administrative review of the Division's Payment Decision and prevailed in their arguments that the Division committed a legal error when calculating the *pro rata* multiplier, the Commission would have possessed the authority to provide an adequate remedy to the Fund claimants by correcting that legal error after fully developing the factual record necessary for evaluating the Division's *pro rata* multiplier calculation.

When a party fails to exhaust administrative remedies before seeking judicial review from a circuit court, the circuit court must dismiss the petition without deciding any other issue: A claimant's "failure to exhaust administrative remedies prevents [the claimant] from obtaining judicial review of the [challenged administrative action]. The trial court thus lacked the authority to take *any action* on [the Fund claimants'] petition for review other than to dismiss the petition for review." *Coleman*, 313 S.W.3d at 158 (emphasis added).

I also believe that the statutorily defined exclusive remedy defined by our General Assembly is relevant to the topic of sovereign immunity that the trial court also relied upon in sustaining the motion to dismiss the underlying putative class action against the agency parties. Without question, the General Assembly created a statutory review path of agency decisions relating to Fund claims, and that statutory review path constituted a limited waiver of immunity. But, the Fund statutory scheme did *not* waive sovereign immunity for the State as to monetary claims for damages against the State relating to unappropriated funds and instead expressly included a preservation of such immunity, to-wit:

> Any award pursuant to this subsection that cannot be paid *due to a lack of funds appropriated for payment of claims* of uncompensated tort victims *shall not constitute a claim against the state.*

§ 537.684.9 (emphasis added). Here, though the Fund claimants have packaged their declaratory lawsuit as one asserting a statutory benefit rather than a tort claim, the relief sought is retrospective in effect (pay us the remainder that we claim to be owed from 2022 Fund claims) and involves the payment of money—money that was *not*

10

appropriated by Missouri's state legislature.  Absent a clear waiver, which this is not, Missouri courts have always been reluctant to permit money claims against the State. *State ex rel. Kansas City Symphony v. State*, 311 S.W.3d 272, 276 (Mo. App. W.D. 2010).  As such, I also agree that the trial court did not err in concluding that the Fund claimants' putative class action lawsuit was barred by the doctrine of sovereign immunity.

Because Fund claimants have failed to exhaust their administrative remedies and because the State has not waived its sovereign immunity relating to Fund claimants' claims for monetary damages, Fund claimants' petition before the circuit court was correctly dismissed by the circuit court.  Accordingly, I would affirm the circuit court's judgment granting the motion to dismiss that was filed by the Respondents below.

_____
Mark D. Pfeiffer, Judge